## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

DANIEL GOSAYE ADEFRIS,

        Plaintiff,

vs.

WILSON TRAILER COMPANY, et al.,

        Defendants.

No. C15-4063-MWB

*REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTION TO
DISMISS*

---

## I.    INTRODUCTION

This case is before me on a motion (Doc. No. 9) by defendants Wilson Trailer Company (Wilson), John Kreber, Carol LaBrune and Richard Libke to dismiss plaintiff's complaint. The pro se plaintiff, Daniel Adefris, has not filed a resistance. The Honorable Mark W. Bennett has referred the motion to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the preparation of a report and recommended disposition. Doc. No. 10. No party has requested oral argument and, in any event, I find that oral argument is not necessary. *See* N.D. Ia. L.R. 7(c). The motion is now fully submitted.

## II.    PROCEDURAL HISTORY

After receiving leave to proceed in forma pauperis, Adefris filed his complaint (Doc. No. 3) on July 23, 2015. On September 1, 2015, defendants filed their motion to dismiss the complaint for failure to state a claim upon which relief may be granted.

The deadline for Adefris to resist the motion was September 18, 2015. N.D. Ia. L.R. 7(e). No response has been filed.[1]

## III.    ADEFRIS' ALLEGATIONS

### A.    The Complaint

The complaint includes the following allegations:

Adefris has been employed by Wilson since November 26, 2007. During the relevant events, defendant Kreber was Wilson's Director of Human Resources, defendant LaBrune was Wilson's Human Resources Manager and defendant Libke was a tool crib worker at Wilson.

On May 16, 2014, Adefris injured his back at work while lifting a heavy steel panel. After he reported the injury, Wilson employer sent him home and instructed him to see the company doctor, Tracy Pick. Adefris saw Dr. Pick on May 20 and 29, 2014. X-rays indicated that his spinal cord was bent. In response to this information, Adefris informed defendant LaBrune that Dr. Pick had recommended an MRI if therapy and pain pills were unsuccessful. LaBrune stated that she "did not like the way [Dr. Pick] does things" and cancelled a third scheduled appointment. She instead instructed Adefris to see another company doctor, Douglas Martin.

Adefris saw Dr. Martin on June 5, 12 and 23, 2014. After Dr. Martin ordered an MRI, LaBrune stated, "MRIs don't lie." Adefris interpreted this comment as an accusation that he was lying about his back pain. The MRI was then scheduled for June

---

[1] A pro se litigant generally is not excused from complying with procedural rules. *McNeil v. United States*, 508 U.S. 106, 113 (1993). Because Adefris failed to resist the motion, it could be granted on that basis alone. *See* Local Rule 7(f) ("If no timely resistance to a motion is filed, the motion may be granted without notice."). However, because the motion seeks relief that would terminate the case, I will address its merits.

30, 2014. On that day, Adefris was scheduled to work eight hours but left early for the MRI. The following day, LaBrune again stated, "MRIs don't lie."

On July 7, 2014, Adefris returned to Dr. Martin for a follow-up appointment. Based on the MRI results, Dr. Martin recommended an injection and scheduled it for July 10. However, Adefris postponed the procedure because he wanted to obtain more information it. The injection was rescheduled for July 18. On July 9, 2014, defendant Kreber called Adefris and asked why he was not at work. Adefris told Kreber that he was following LaBrune's instructions to stay home. Kreber told Adefris that he needed to call in to report any absences. Kreber then asked Adefris to come to work for 4 hours and told him to come to Kreber's office to sign papers for workers' compensation purposes. Adefris signed the papers without reading them. It turns out that they were not related to workers' compensation. Instead, they addressed the hours he would work while on medical restrictions, described call-in procedures and included a statement that Wilson would not pay for certain medical services because they were not pre-approved. While Adefris was signing the papers, Kreber asked: "Why don't you find a different job?" Adefris responded: "Would you hire someone with a back I (sic) injury?" Kreber then stated: "This is not a place for you to do what you want."

On July 23, 2014, Adefris was again injured while working and was sent to the emergency room. LaBrune told the medical personnel that Adefris had been "going from doctor to doctor trying to get narcotics." LaBrune also yelled at Adefris: "You people abuse the system."

Wilson required Adefris to work 9-hour shifts, despite medical restrictions and documented medical issues. By contrast, Wilson permitted a white employee to work 4-hour shifts even though that employee's MRI showed no issue.

## B.	The Exhibits

Adefris attached seven exhibits to his complaint. Doc. No. 3-1 at 1-10. Some of those exhibits contain allegations that go beyond those set forth in the complaint. Exhibit 1 is a narrative that focuses entirely on an alleged confrontation between Adefris and defendant Libke, along with the alleged responses of various Wilson supervisors to that confrontation. *Id.* at 1-3. The confrontation allegedly occurred on October 28, 2014. *Id.* at 1.

Exhibit 2 includes a narrative in which Adefris alleges that his employment was terminated in December 2014 in retaliation for filing a civil rights complaint. *Id.* at 4. It also contains an Iowa Civil Rights Commission (ICRC) authorization release form. *Id.* at 5. Exhibits 3, 4 and 5 are notices Adefris received from the ICRC and the Equal Employment Opportunity Commission (EEOC). *Id.* at 6-8. Exhibit 6 is a letter from Kreber to Adefris, dated December 4, 2014, stating that Adefris' employment was being terminated because he acquired three or more written disciplinary warning letters in a one-year period. *Id.* at 9. Finally, Exhibit 7 is a union grievance form that asserts, without details, that Adefris was intimidated, coerced or harassed by management on or about August 14, 2014. *Id.* at 10.

## C.	Legal Theories

I agree with defendants that when construing Adefris' complaint (including the exhibits) liberally, it may allege: (a) claims of discrimination, harassment, and retaliation based on race and national origin under the Iowa Civil Rights Act (ICRA) and Title VII of the Civil Rights Act of 1964 (Title VII); (b) claims of discrimination, harassment, and retaliation based on race under 42 U.S.C. § 1981 (Section 1981); and (c) claims of discrimination and denial of accommodation based on disability under the Americans with Disabilities Act (ADA) and the ICRA. Doc. No. 9-1 at 2.

## IV.    THE ADMINISTRATIVE COMPLAINT

On August 5, 2014, Adefris filed a complaint (the administrative complaint) with the Sioux City Human Rights Commission (SCHRC).    Doc. No. 9-3.    It was cross-filed with the ICRC and the EEOC.    Doc. No. 9-4 at 1.    The administrative complaint alleged that Adefris is a black male of African origin who was denied accommodation/modification, denied benefits and harassed due to his race and national origin.    Doc. No. 9-3 at 1-2.    The administrative complaint did not allege any retaliatory action.    *Id.* at 2.

Adefris included the same narrative in the administrative complaint that is contained in the body of his complaint in this case.    *Compare* Doc. No. 3 at 2-4 with Doc. No. 9-3 at 4-6.    In the administrative complaint, Adefris named Kreber and LaBrune as the individuals who discriminated against him and Wilson as the legal entity involved in the discrimination.    Doc. No. 9-3 at 2-3.

On March 26, 2015, the ICRC issued letters to Adefris and Wilson indicating that the SCHRC, the agency responsible for processing the administrative complaint, had determined that it should be closed.    Doc. No. 3-1 at 6; Doc. No. 9-5.    For that reason, the ICRC likewise administratively closed the case.    Doc. No. 3-1 at 6.    The letter issued to Adefris advised him of certain options available to him, including (a) a request for reconsideration, which could be filed within 30 days of the date of the letter, (b) a request for a right-to-sue letter, which could be made within two years of the date of the letter, and (c) a request for review by the EEOC.    *Id.*    Adefris does not allege that he availed himself of any of these options.

On June 1, 2015, the EEOC issued a right-to-sue letter advising Adefris that he had the right to initiate a lawsuit within 90 days of his receipt of the letter.    Doc. No. 3-1 at 7.

## V. APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir.2012) (quoting *Iqbal*, 556 U .S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp.*

*v. Structural Polymer Grp.*, 592 F.3d 893, 896 n. 4 (8th Cir. 2010)). While factual "plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable legal theory. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Intern., Ltd. v. Lee*, 1 F.Supp.3d 927 (N.D. Iowa 2014).

"The well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules." *Topichian v. JPMorgan Chase Bank*, N.A., 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051, 1057–58 (8th Cir. 2002)). "A pro se complaint must be liberally construed, *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L.Ed.2d 251 (1976), and 'pro se litigants are held to a lesser pleading standard than other parties[,]' *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402, 128 S. Ct. 1147, 170 L.Ed.2d 10 (2008)." *Id.* If an allegation is discernable, even if it lacks "legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Id.* (citing *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004)).

In deciding a motion brought pursuant to Rule 12(b)(6), the court may consider certain materials outside the pleadings, including (a) "the materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint,'" *Whitney*, 700 F.3d at 1128 (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n. 4 (8th Cir. 2003)), and (b) "'materials that are part of the public record or do not contradict the complaint.'" *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Thus, the court may "consider 'matters incorporated by reference or integral to the claim, items

subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment." *Miller*, 688 F.3d at 931 n. 3 (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)). Information contained in EEOC and ICRC records are public records and do not require converting a motion to dismiss to a motion for summary judgment. *Lucht v. Encompass Corp.*, 419 F. Supp. 2d 856, 860 n.2 (S.D. Iowa 2007); *accord Blakley v. Schlumberger Technology Corp.*, 648 F.3d 921, 931 (8th Cir. 2011).

## VI. DISCUSSION

Defendants argue the complaint should be dismissed because (1) Adefris failed to exhaust all administrative remedies under Title VII, the ADA and the ICRA, (2) the individual defendants are not subject to liability under Title VII and the ADA and (3) Adefris has failed to state any claim that is plausible on its face.

### A. Exhaustion of Administrative Remedies

Defendants raise two arguments concerning the exhaustion of administrative remedies. With regard to Adefris' claims under the ICRA, they note that he has not received a right-to-sue letter from the ICRC. As such, defendants contend that Adefris is barred from pursuing any ICRA claims in this case.

As for Adefris' claims under Title VII and the ADA, defendants argue that the allegations Adefris presents in this case – particularly those described in exhibits to his complaint – go beyond the claims set forth in his administrative complaint. Thus, they contend that even if Adefris exhausted administrative remedies with regard to some

allegations, he failed to do so with regard to others.   I will address these arguments separately.[2]

### 1.    ICRA Claims

The Iowa Supreme Court has explained the requirements for filing suit under the ICRA as follows:

> There are two conditions to filing a petition in district court for unfair or discriminatory practices.   First, the petitioner must file a timely complaint with the Civil Rights Commission.   Iowa Code § 216.16(1)(a) (1997). Second, the Commission must issue a release or right-to-sue letter no earlier than sixty days after the complaint has been on file.   *Id.* § 216.16(1)(b).

*Ritz v. Wapello County Bd. of Supervisors*, 595 N.W.2d 786, 790 (Iowa 1999); *see also Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 680 n.1 (Iowa 2013) (describing the ICRA's procedures).   A federal court may not consider a claim arising under the ICRA if that statute's administrative requirements have not been satisfied.   *See Torres v. North Fayette Comm. School Dist.*, 600 F. Supp. 2d 1026, 1030 (N.D. Iowa 2008) (citing cases).

Here, defendants contend Adefris did not obtain a right-to-sue letter from the ICRC before filing this action.   Adefris does not allege otherwise in his complaint, nor has he filed a resistance challenging the allegation.   As such, I find that Adefris has failed to exhaust his administrative remedies as to any claims arising under the ICRA and recommend that the motion to dismiss be granted as to those claims.

---

[2] There are no administrative exhaustion requirements for claims brought pursuant to Section 1981.   *See Winbush v. State of Iowa By Glenwood State Hosp.*, 66 F.3d 1471, 1486 (8th Cir. 1995).

## 2. Title VII and ADA Claims

### a. Applicable Standards

Before commencing a judicial action based on alleged violations of Title VII, a plaintiff must (1) timely file a charge of employment discrimination with the EEOC (or an appropriate state or local agency) and (2) receive a right-to-sue letter from the EEOC. 42 U.S.C. § 2000e—5(b),(e) and (f). "A Title VII plaintiff must exhaust administrative remedies before bringing suit in federal court." *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006). Likewise, filing an administrative complaint and obtaining a right-to-sue letter from the EEOC are prerequisites to any private action under Title I of the ADA. *See* 42 U.S.C. § 12117(a) (incorporating § 2000e-5).

"Exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 180–81 (1989)). "The proper exhaustion of administrative remedies gives the plaintiff a green light to bring h[is] employment-discrimination claim, along with allegations that are 'like or reasonably related' to that claim, in federal court." *Shannon v. Ford Motor Co.*, 72 F.3d 678, 684 (8th Cir. 1996) [emphasis added]. The Eighth Circuit has elaborated on this principle as follows:

> The employee may not bring allegations in a Title VII action if they go beyond those that "could reasonably be expected to grow out of the charge of discrimination" filed with the EEOC. *Kells v. Sinclair Buick–GMC Truck, Inc.*, 210 F.3d 827, 836 (8th Cir. 2000) (internal quotation omitted). While a charge of discrimination "need not specifically articulate the precise claim, it must nevertheless be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim." *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 697 (8th Cir. 2009) (internal quotation omitted).

*Malone v. Ameren UE*, 646 F.3d 512, 516 (8th Cir. 2011); *see also Fanning v. Potter,* 614 F.3d 845, 851–52 (8th Cir. 2010) ("the civil suit can be only 'as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination'") (quoting *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000)).

### b.    Analysis

There is no dispute that Adefris received a right-to-sue letter from the EEOC. Doc. No. 3-1 at 7.   In relevant part, the letter stated:

**-NOTICE OF SUIT RIGHTS-**
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.   You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.   Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.   (The time limit for filing suit based on a claim under state law may be different.)

*Id*. [emphasis in original].   This letter was dated June 1, 2015.   *Id*.   Adefris commenced this action on July 22, 2015, which was well within the 90-day limitations period.   Thus, and at least with regard to some claims, Adefris exhausted his administrative remedies under Title VII and the ADA.

Defendants argue, however, that certain claims described in the exhibits to Adefris' complaint were not exhausted.   Adefris filed his administrative complaint on August 5, 2014.   Doc. No. 9-3 at 1.   He represented that the most-recent discriminatory incident occurred on July 9, 2014.   *Id*. at 3.   Exhibits 1, 2, 6 and 7 to his complaint in this case reference alleged events that occurred after Adefris filed the administrative complaint.   Doc. No. 3-1 at 1-4, 9-10.   Adefris does not allege that he

amended his administrative complaint to include allegations based on these post-filing incidents.[3]

Moreover, from a subject matter perspective, some allegations contained in Adefris' exhibits go beyond those described in the administrative complaint. In the administrative complaint, Adefris checked boxes indicating that the discriminatory actions taken against him were: "Denied Accommodation/Modification"; "Denied Benefits"; and "Harassment." Doc. No. 9-3 at 1. He then alleged that he was discriminated against because of his race, national origin and disability (real or perceived). *Id.* at 1-2. He did not allege that his employment was terminated or that he was subjected to retaliation of any kind. *Id.*

Adefris' Exhibit 2 is a narrative statement in which he asserts that his employment was terminated in retaliation for his filing of the administrative complaint. Adefris alleges that defendant Kreber twice demanded that he drop the case and that he was discharged because he refused to do so. Doc. No. 3-1 at 4. Exhibit 6, which is the letter notifying Adefris that his employment was being terminated, apparently relates to the retaliation claim. *Id.* at 9. Because Adefris did not describe a retaliation claim in his administrative complaint, that claim was not exhausted. *See Wallin v. Minnesota Dept. of Corrections*, 153 F.3d 681, 688 (8th Cir. 1998) ("it is well established that retaliation claims are not reasonably related to underlying discrimination claims.") (citations omitted)); *see also Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 852-53 (8th Cir. 2012) (holding that a party must exhaust administrative remedies even if the retaliation claim flows as a direct result of the original discrimination claim). To the

---

[3] The EEOC's regulations provide that an administrative complaint may be amended "to cure technical defects or omissions, including failure to verify the charge, or to clarify or amplify allegations made therein." 29 C.F.R. § 1601.12(b). "Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." *Id.*

extent Adefris asserts a claim for retaliatory discharge in this case, under either Title VII or the ADA, I recommend that it be dismissed.

This leaves Exhibits 1 and 7. Both describe alleged harassment. Exhibit 1 contains a detailed description of alleged harassment by defendant Libke on October 28, 2014, including the use of racial epithets, and addresses Adefris' efforts to bring the issue to the attention of Wilson's management. Doc. No. 3-1 at 1-3. Exhibit 7 is a grievance form that makes reference to a claim that Adefris was "intimated, coerced and harassed by management" on or about August 14, 2014. *Id.* at 10. While both alleged incidents post-date the administrative complaint, they do share some subject-matter similarity to the events described in that complaint. As noted above, Adefris alleged "Harassment" as one of the discriminatory action taken against him. Doc. No. 9-3 at 1. He then alleged that he was accused of falsifying information and was told: "You people abuse the system." *Id.* at 4-5.

"[C]ourts should not use Title VII's administrative procedures as a trap for unwary pro se civil-rights plaintiffs. … We …, therefore, when appropriate, construe civil-rights and discrimination claims charitably." *Shannon*, 72 F.3d at 685; *see also Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988) (noting that discrimination complainants often file administrative complaints without legal assistance and observing that courts must "interpret[ ] [administrative charges] with the utmost liberality in order not to frustrate the remedial purposes of Title VII."). Here, the administrative complaint included allegations that Adefris was subjected to harassing conduct based on his race. While the better course would have been for him to amend his administrative complaint to add allegations about the incidents described in Exhibits 1 and 7, I do not find this flaw to be fatal. Those incidents are reasonably related to the administrative complaint in the sense that any reasonable investigation of that complaint likely would have brought the incidents to light. As such, I find that Adefris has exhausted his administrative remedies with regard to the allegations described in Exhibits 1 and 7 to his complaint and

recommend that those allegations be construed to be part of Adefris' complaint for purposes of considering whether he has stated a plausible hostile work environment claim.

## B.   *Liability of Individual Defendants*

Defendants contend that all claims brought against the individual defendants under Title VII and the ADA must be dismissed because those statutes contemplate liability only against an employer, not against individual employees.[4]   They are correct.

It is well settled that individual employees cannot be personally liable for alleged violations of Title VII.   *See, e.g.*, *McCullough v. University of Arkansas for Medical Sciences*, 559 F.3d 855, 860 n.2 (8th Cir. 2009) (citing *Bonomolo–Hagen v. Clay Cent.-Everly Cmty. Sch. Dist.*, 121 F.3d 446, 447 (8th Cir. 1997) (per curiam)).   As such, I recommend that the motion to dismiss be granted with regard to any Title VII claims Adefris asserts against defendants Kreber, LaBrune and Libke.

As for the ADA, Title I of the act prohibits discrimination in employment "against a qualified individual on the basis of disability."   42 U.S.C. § 12112(a).   Although the Eighth Circuit has yet to determine whether individual defendants may be held liable for Title I violations, it has held that no individual liability arises under Title II.[5]   *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999).   Moreover, numerous federal courts have held that no individual liability arises with regard to Title I claims. *See, e.g.*, *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 744 (10th Cir. 1999); *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996); *Weber v. Ibrew Local 124 Apprenticeship Bd. Members*, No. 4:14–CV–1118, 2015 WL 4135672, at *2 (W.D. Mo.

---

[4] Defendants do not argue that there can be no individual liability for claims brought under Section 1981.   As I will discuss further, *infra*, such liability may arise under certain circumstances.

[5] Title II of the ADA applies to state and local government entities, and, in general, protects individuals with disabilities from discrimination in services, programs, and activities provided by those entities.   *See* 42 U.S.C. §§ 12131, *et seq*.

14

July 7, 2015) (citing *Ebersole v. Novo Nordisk, Inc.*, No. No. 1:11cv25 SNLJ, 2011 WL 6115655, at *1–2 (E.D. Mo. Dec. 8, 2011); *Donnelly v. St. John's Mercy Medical Center*, No. 4:08-CV-347 CAS, 2008 WL 2699859, at *1–2 (E.D. Mo. June 30, 2008). Based on the reasoning set forth in these cases, and the lack of any persuasive authority suggesting that individual employees may be subject to liability under Title I of the ADA, I recommend that the motion to dismiss be granted with regard to any ADA claims Adefris asserts against the individual defendants.

## C.    *Plausibility*

Finally, defendants argue that the allegations set forth in Adefris' complaint fail to state any claim upon which relief may be granted.   Because I have already found that Adefris failed to exhaust administrative remedies with regard to (a) his claims under the ICRA and (b) any claims for retaliatory discharge under Title VII or the ADA, I must consider whether Adefris has stated any other, plausible claims under Title VII, the ADA or Section 1981.

### 1.    *Discrimination Claims Under Title VII and/or Section 1981*

In order to establish a prima facie case of race or national origin discrimination, a plaintiff must show (1) that he is a member of a protected class; (2) that he was meeting his employer's legitimate job expectations; (3) that he suffered an adverse employment action; and (4) that he was treated differently than similarly situated employees who were not members of his protected class, giving rise to an inference of discrimination. *Jackman v. Fifth Judicial Dist.*, 728 F.3d 800, 804 (8th Cir. 2013) (citing *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 461 (8th Cir. 2010)). [6]    Here, Adefris'

---

[6] Courts assess Title VII and Section 1981 race discrimination claims under the same framework. *Johnson v. AT&T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005).

administrative complaint indicates that he is a black male of African origin. Doc. No. 9-3 at 1-2. Adefris alleges that he requested a reduced work schedule due to a work-related injury and that this request was refused. Doc No. 3 at 3. He also alleges that a similarly-situated white employee was allowed to work a reduced schedule. *Id.* Finally, he alleges that certain remarks (such as "You people abuse the system") suggest racial animus and contends that he was treated less-favorably than the comparable white employee because of his race or nationality.[7] *Id.*

Thus, Adefris has expressly alleged that he was treated differently because of his membership in at least one protected class. However, the allegedly-different treatment did not rise to the level of adverse employment action. Adverse employment actions "include termination, demotion, transfers involving changes in pay or working conditions, and negative evaluations used as the basis for other employment actions." *Huynh v. U.S. Dept. of Transportation*, 794 F.3d 952, 959 (8th Cir. 2015) (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 969 (8th Cir. 1999)). Thus, "not 'everything that makes an employee unhappy is an actionable adverse employment action.'" *Id.* (quoting *LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 691 (8th Cir. 2001)).

Here, Adefris does not allege that Wilson took any action to change his pay, job status or working conditions. Instead, he argues that the discriminatory act was Wilson's denial of his request to change his working conditions by working fewer hours. Federal courts have held that the denial of a request to work a reduced schedule does not constitute adverse employment action. *See, e.g.*, *Kurowski v. Shinseki*, 557 Fed. Appx. 549, 554 (7th Cir. 2014); *Brack v. Shoney's, Inc.*, 249 F. Supp. 2d 938, 951 (W.D.

---

[7] As I noted earlier, Adefris' administrative complaint did not allege that his employment was terminated for discriminatory reasons. Doc. No. 9-3 at 1-2. Nor does his complaint in this case make any allegations of a discriminatory discharge. The exhibits to his complaint allege a retaliatory discharge, but not a discriminatory discharge. Doc. No. 3-1 at 4, 9. I have already concluded that Adefris failed to exhaust his administrative remedies under Title VII as to that claim. I will address the retaliatory discharge theory under Section 1981 *infra*.

Tenn. 2003).  I agree.  While the denial of Adefris' request may have implications under the ADA (an issue I will analyze *infra*), I find that it does not fall within the scope of "adverse employment action" for purposes of a discrimination claim.  As such, I recommend that the motion to dismiss be granted with regard to Adefris' claims of race and national original discrimination under Title VII and Section 1981.

### 2.    ADA Claims

As noted earlier, I construe Adefris' complaint to assert ADA claims of disability discrimination and denial of accommodation.   I will address those claims separately.

### a.    Disability Discrimination

To establish a prima facie case of disability discrimination, a plaintiff must prove he (1) had a disability within the meaning of the ADA, (2) was qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) suffered an adverse employment action because of his disability.   *Olsen v. Capital Region Med. Center*, 713 F.3d 1149, 1153 (8th Cir. 2013); *Kincaid v. City of Omaha*, 378 F.3d 799, 804 (8th Cir. 2004).   Having carefully reviewed Adefris' complaint and its exhibits, I find no allegations that give rise to a plausible claim of disability discrimination.   He alleges that he suffered a work injury and sought a reduced schedule because of that injury.   He further alleges that Wilson denied that request.   As I explained earlier, denying an employee's request to work fewer hours is not an "adverse employment action."   Moreover, Adefris alleges that Wilson's denial of the request was based on his race or national origin, not any alleged disability.   Because Adefris' allegations do not state a claim for disability discrimination, I recommend that the motion to dismiss be granted with regard to that claim.

### b.    *Failure to Accommodate*

Failure to accommodate claims are not evaluated under the *McDonnell Douglas* burden-shifting analysis.    *Peeble v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). Instead, "a modified burden-shifting analysis" is applied.    *Id.* (citing *Fenney v. Dakota, Minnesota & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003)).    "This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive."    *Id.*    Rather, the alleged discrimination "is framed in terms of the failure to fulfill an affirmative duty - the failure to reasonably accommodate the disabled individual's limitations."    *Id.* at 767.    To prevail, the plaintiff must prove: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.    *E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014) (citing *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009)).

Adefris' complaint states a plausible claim for failure to accommodate.    He alleges that he suffered a work-injury that caused back pain and, when he walked, pain that shot down his left leg.    Doc. No. 3 at 2.    He further alleges that an MRI revealed a condition that required an injection and that he then injured himself again while at work. *Id.* at 2-3.    Whether or not these alleged injuries rose to the level of "disability," as defined by the ADA, is an issue that must be explored through discovery.[8]    In addition, Adefris' alleges that Wilson knew of his injury, that he requested an accommodation in the form of a reduced work schedule following the injury and that Wilson refused his

---

[8] The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities."    42 U.S.C. § 12102(1).

request.   At the pleading stage, I find these allegations sufficient to state a claim of failure to accommodate under the ADA.

### 3.      *Hostile Work Environment Claims (Title VII, ADA and Section 1981)*

I have construed Adefris' complaint to allege hostile work environment claims under Title VII, the ADA and Section 1981.   For the reasons discussed earlier, the individual defendants are not proper parties to claims brought pursuant to Title VII or the ADA.   As such, after summarizing the applicable standards I will consider whether the complaint states plausible hostile work environment claims against Wilson under any statute.   I will then address the issue of whether Adefris' allegations give rise to potential individual liability under Section 1981.

### a.      *Applicable Standards*

Hostile work environment claims are actionable under Title VII, Section 1981 and the ADA.   *Shaver v. Independent Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003) (ADA); *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076 (8th Cir. 2005) (Title VII and Section 1981).   A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Eliserio*, 398 F.3d at 1076 (internal quotations omitted).   In order to establish a hostile work environment claim, a plaintiff must prove: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment based on his membership in the protected group; (3) the harassment affected a term, condition, or privilege of his employment; (4) his employer knew or should have known of the harassment; and (5) the employer failed to take proper action.   *Rickard v. Swedish Match North America, Inc.*, 773 F.3d 181, 184-85 (8th Cir. 2014) (citing *Peterson v. Scott County*, 406 F.3d 515, 523–24 (8th Cir. 2005), *abrogated on other grounds by Torgerson*

*v. City of Rochester*, 643 F.3d 1031, 1043, 1059 (8th Cir. 2011) (en banc)). However, a plaintiff need not prove the final two elements if his supervisor created the hostile environment. *Id.* at 184 n.2 (citing *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 n.5 (8th Cir. 2000)).

### b. Analysis

#### i. Against Wilson

Adefris' complaint, including Exhibits 1 and 7, describe alleged harassment based primarily on Adefris' race. He contends that defendant LaBrune made comments June and July of 2014 suggesting that he was not being truthful in about his pain. Doc. No. 3 at 2-3. He also contends that on July 23, 2014, after he suffered a second work-related injury and obtained treatment, LaBrune "screamed" at him that "[y]ou people are abusing the system." Doc. No. 3 at 3. Adefris contends that the phrase "you people" was a reference to his race. *Id.*

Exhibit 1 to the complaint describes an incident involving a co-worker – defendant Libke – that allegedly took place on October 28, 2014. Doc. No. 3-1 at 1-2. He contends that Libke yelled at him and called him a "fucking nigger." *Id.* at 1. Adefris further alleges that after he walked away, other employees heard Libke continue to call Adefris "every racist thing he could think of." *Id.* at 2. He alleges that he brought the incident to the attention of Wilson's management and his union's representatives. *Id.* He further states that defendant Kreber met with him on October 30, 2014, and asked him to describe the incident. Adefris does not state what, if anything, Wilson did in response to the incident.

Finally, Exhibit 7 to the complaint is a union grievance report form which states that Adefris was "intimated, coerced and harassed by management" on or about August 14, 2014. *Id.* at 10. The document includes Kreber's written response, at the bottom of the page, which requests a "factual basis for your accusations that give rise to the

grievance." *Id.*  Adefris provides no details about the alleged incident, nor does he state what, if anything, happened as a result of the grievance.  The complaint includes no allegation that the August 14, 2014, incident was based on Adefris' race, national origin or disability.

Considering all of Adefris' allegations, I find that he has not stated a plausible claim that he was subjected to harassment that was so severe and pervasive as to have affected a term, condition, or privilege of his employment.  In determining whether harassment satisfies that requirement, courts must consider all of the relevant circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Woodland v. Joseph T. Ryerson & Son. Inc.*, 302 F.3d 839, 843 (8th Cir. 2002).  Not all conduct that is deplorable and offensive rises to this level, as courts strive to avoid imposing "a code of workplace civility." *Id.*  Thus, for example, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not rise to an actionable level. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  Instead, "[m]ore than a few isolated incidents are required," and the harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment." *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999) (citations omitted); *see also Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003) (noting that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Under this standard, hostile environment claims have been rejected as a matter of law in cases involving harassment more severe and pervasive than what Adefris alleges here.  In *Woodland*, the Eighth Circuit Court of Appeals affirmed the grant of summary judgment in favor of the employer despite evidence of the following conduct over a four-

to-five year period:

> • On three occasions, a co-worker told Woodland that another employee had used a racial epithet in referring to him.

*    *    *

> • On two other occasions, Woodland as union steward heard about racial epithets directed at other African American employees. He advised those employees either to do nothing or to report the conduct to a supervisor. The one time an incident was reported, management told the offending employee that if he did not cease using such terms he would be fired.

> • On another occasion, a co-worker made an obscene gesture when Woodland said he should get back to work. There was no apparent racial connotation to the gesture. A foreman reported the behavior to Renaud, who offered to fire the offensive employee. Again, Woodland asked Renaud not to fire him.

> • Several years ago, copies of a "poem" with racist, sexist, and homophobic messages were strewn about the plant. Management immediately collected and disposed of the copies. In 1996, racist graffiti-drawings of "KKK," a swastika, and a hooded figure-appeared on the walls of one of the men's restrooms at the plant. Woodland brought the graffiti to the attention of management. He was furnished spray paint to cover the graffiti. Plant manager Thomas Eckert called a meeting and explained such graffiti would not be tolerated. The plant operations manager later posted flyers warning that anyone placing inappropriate literature on the walls would be disciplined severely. Woodland testified the misbehavior stopped.

302 F.3d at 844. While recognizing that the conduct at issue was offensive, the court concluded that "it was 'neither severe nor pervasive enough to create a hostile work environment.'" *Id.* at 844 (quoting *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 579 (8th Cir. 1999)).

Similarly, in *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002), the court reversed the district court's denial of the defendant's motion for judgment as a matter of law after a jury awarded substantial damages to the plaintiff on a hostile work

environment claim. *Id.* at 930-31. The evidence disclosed many incidents of boorish, obnoxious behavior directed at the plaintiff, Diana Duncan, over a period of more than two years. *Id.* at 931-32. Soon after Duncan's employment started, her supervisor (Booth) propositioned her. *Id.* at 931. Booth became hostile toward Duncan, and critical of her work, after she rejected his advance. *Id.*

During the remainder of Duncan's employment, Booth engaged in various forms of inappropriate conduct, including: (1) directing Duncan to use a computer that had a picture of a naked woman as its screen saver, (2) touching Duncan's hand unnecessarily on four or five occasions, (3) maintaining a planter in his office that was shaped like a man and had a hole in the front of the man's pants through which a cactus protruded, (4) responding to Duncan's request for a position as illustrator by telling her to draw his planter, (5) taking Duncan to a bar against her will after an off-site event and (6) directing Duncan to type a draft of the beliefs of the "He–Men Women Hater's Club."[9] *Id.* at 931-32.

Duncan resigned after refusing to type the requested draft. *Id.* at 932. In reversing the judgment in her favor, the Eighth Circuit found that the harassment she endured "was not so severe or pervasive as to alter a term, condition, or privilege of Duncan's employment." *Id.* at 934. The court stated:

> To clear the high threshold of actionable harm, Duncan has to show that

---

[9] The "beliefs" were as follows:

> • Constitutional Amendment, the 19th, giving women [the] right to vote should be repealed. Real He–Men indulge in a lifestyle of cursing, using tools, handling guns, driving trucks, hunting and of course, drinking beer.
> • Women really do have coodies [sic] and they can spread.
> • Women [are] the cause of 99.9 per cent of stress in men.
> • Sperm has a right to live.
> • All great chiefs of the world are men.
> • Prostitution should be legalized.

*Id.* at 931-32.

"the workplace is permeated with discriminatory intimidation, ridicule, and insult." . . . "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." . . . Thus, the fourth part of a hostile environment claim includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive. . . . In determining whether the conduct is sufficiently severe or pervasive, we look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." . . . However, Title VII is "not designed to purge the workplace of vulgarity." . . . These standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

*Id.* [citations omitted]. The court concluded by stating that while "Booth's actions were boorish, chauvinistic, and decidedly immature . . . we cannot say they created an objectively hostile work environment permeated with sexual harassment." *Id.* at 935.

By contrast, a district court's grant of summary judgment for the employer was reversed in *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906 (8th Cir. 2003). The court summarized the evidence of harassment as follows:

Our review of the record (which consists primarily of Mr. Reedy's deposition testimony) reveals five incidents that can plausibly be characterized as involving racial harassment. One incident involved a fellow Quebecor employee. Apparently, the employee agreed to bring back lunch for a group of Quebecor employees, including Mr. Reedy. When he failed to produce the lunch that Mr. Reedy had ordered, Mr. Reedy asked him whether he had bought it. The employee responded by throwing money at Mr. Reedy and saying, "Fucking nigger, go your own self the next time." The employee's father (also a Quebecor employee) laughed as he witnessed the incident. Mr. Reedy did not file a complaint or otherwise mention this incident to a supervising employee.

Mr. Reedy also witnessed two ugly occurrences of relevance. In one

incident, two employees approached Rickey Huntley, a black man, called him a "punk ass nigger" and told him that they were going to "whip his punk ass." Mr. Reedy did not involve himself in the dispute, but was later called into the office of the plant manager, Kevin Morris, to confirm Mr. Huntley's account of the incident. As a result of the investigation, one of the offending employees received a one-week suspension and the other was terminated. On another occasion, Mr. Reedy witnessed an employee accusing Travis Moore, another black employee, of stealing his car radio. After exclaiming that "all you niggers steal," the employee threw a metal blade at Mr. Moore. The offender was terminated after an investigation.

Lastly, in his deposition Mr. Reedy describes incidents involving the exhibition of racial graffiti. According to that testimony, during September, 1998, the phrase "Tommy smoked crack, white crack" was written in a men's bathroom stall (one of two at the plant) and the word "coon" was written below Mr. Reedy's name. In addition, there appeared a drawing of an ape accompanied by the phrase "all niggers must die." Mr. Reedy reported the graffiti to Keith Bender, his immediate supervisor, and to Mr. Morris. Soon thereafter, the graffiti was painted over.

Mr. Reedy claims that the racial graffiti reappeared in October 1998. This time, he says, his name was written below the phrase "kill all niggers" on the bathroom handrail. Mr. Reedy again reported the offending bathroom graffiti, to which Mr. Morris allegedly responded, "I got it off once. What do you want me to do, tear the wall down?" This graffiti was not removed until after Mr. Reedy left the employment of Quebecor.

333 F.3d at 908-09. In finding that this evidence was sufficient, the court distinguished *Woodland* on three bases: (1) the frequency of harassing incidents was higher in *Reedy* than in *Woodland*, (2) the racist graffiti in *Woodland* was removed immediately and (3) the messages conveyed in the *Reedy* workplace were direct and specific threats against the plaintiff, not just "generically threatening" as in *Woodland*. *Id.* at 909-10.

Here, the complaint alleges the following, specific incidents of harassment:

1.    Comments by defendant LaBrune in June and July, 2014, suggesting that Adefris was lying about his pain, including one comment ("You people abuse the system") that Adefris perceived to be a reference to his race.

2.    An incident on August 14, 2014, during which management is alleged to have "intimated, coerced and harassed" Adefris in some unspecified way.

3.    An outburst by defendant Libke on October 28, 2014, during which he directed the word "nigger" at Adefris.

Doc. No. 3 at 2-3; Doc. No. 3-1 at 1-3, 10.   Importantly, Adefris does *not* allege that these incidents are mere examples and that he was regularly subjected to harassment during his employment at Wilson.   Thus, these incidents form the entire basis of his hostile work environment claim.   They simply do not rise to the level of severity and pervasiveness necessary to state a plausible claim for relief.

Incident number 3 (Libke's alleged comments) is clearly the most-severe and overtly racial of the alleged events.   If that incident occurred as Adefris describes, it was deplorable and idiotic.   However, being subjected to one instance of loud, racist stupidity does not come close to meeting the "high threshold of actionable harm." *Duncan,* 300 F.3d at 934.   The law is clear that the "mere utterance of an ethnic or racial epithet" does not suffice.   *Meritor Sav. Bank*, 477 U.S. at 67.   If Adefris alleged that he was subjected to such offensive behavior on a regular basis, he may well have stated a plausible, hostile work environment claim.   Instead, incident number 3 is described as an isolated, one-time event.

Likewise, incident number 1, which involves stray remarks by LaBrune about Adefris' veracity, is not depicted as being anything other than an isolated situation. Even if LaBrune's opinion was related to Adefris' status in a protected-group, the comments were not threatening, ongoing or pervasive.   Finally, the complaint provides no details about incident number 2 and makes no allegation that it had any relationship to Adefris' race, national origin or disability.

In short, the complaint does not allege harassment based on any protected-group status that was so recurring, intimidating or offensive as to have "poisoned the work environment."   *Scusa*, 181 F.3d at 967.   As such, I recommend that the motion to

dismiss be granted with regard to any claim against Wilson on a hostile work environment theory.

### ii.    *Against the Individual Defendants*

As explained earlier, Section 1981 provides the only available avenue for relief against the individual defendants on a hostile work environment theory.    Individuals may be held personally liable under Section 1981 "for certain types of discriminatory acts, including those giving rise to a hostile work environment." *Patterson v. County of Oneida, New York*, 375 F.3d 206, 226 (2d Cir. 2004).    Such liability "requires proof of intentional discrimination *by that defendant*."    *Ellis v. Houston*, 742 F.3d 307, 327 (8th Cir. 2014) (Loken, J., concurring) (citing *General Bldg. Contractors Ass'n v. Pa.*, 458 U.S. 375, 391 (1982)) [emphasis in original].    Because I have already determined that Adefris' allegations fall short of establishing a plausible claim that he was subjected to a hostile work environment at Wilson, no individual liability can arise.    I recommend that the motion to dismiss be granted with regard to any claim against any individual defendant on a hostile work environment theory.

### 4.    *Remaining Section 1981 Claims*

While I have recommended the dismissal of any claims under Title VII or the ADA relating to the termination of Adefris' employment on grounds that he did not exhaust administrative remedies as to those claims, no such exhaustion requirement applies under Section 1981.    Thus, I must consider whether the complaint, including its exhibits, states a plausible claim for discriminatory or retaliatory discharge under that statute.

The complaint makes no allegation that Adefris was discharged due to his race. As such, I find that Adefris has not stated a claim upon which relief may be granted on that theory.    Adefris does, however, allege very specifically that Wilson terminated his employment in retaliation for his filing of an administrative civil rights complaint.    Doc.

No. 3-1 at 4. Adefris alleges that on both August 20, 2014, and August 22, 2014, defendant Kreber told him to drop his civil rights case. *Id.* He then alleges: "Shortly after I refuse to drop the case start racking up the points and discharge me!!" *Id.* By "points," Adefris apparently refers to disciplinary warnings, as the termination letter attached to his complaint states that he was being discharged "for acquiring 3 or more written disciplinary warning letters within a one year time period." *Id.* at 9.

Section 1981 encompasses claims of retaliation. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). The analysis that applies to retaliation claims under Title VII applies equally to Section 1981 retaliation claims. *Takele v. Mayo Clinic*, 576 F.3d 834, 838 (8th Cir. 2009). To succeed, Adefris must first establish a prima facie case of retaliation by demonstrating: "(1) that he[ ] engaged in statutorily protected activity; (2) an adverse employment action was taken against him[ ]; and (3) a causal connection exists between the two events." *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1030-31 (8th Cir. 2013) (quoting *Gilooly v. Mo. Dep't of Health and Senior Servs.*, 421 F.3d 734, 739 (8th Cir. 2005)).

At this stage of the case, I find that Adefris has presented a plausible case of retaliatory discharge in violation of Section 1981. Adefris engaged in statutorily protected activity on August 5, 2014, by filing an administrative civil rights complaint in which he alleged harassment and discrimination based on race and other characteristics. He alleges two very-specific, subsequent demands by Kreber (Wilson's Director of Human Resources) that he drop his civil rights case. Next, he alleges that after he refused to drop the case, Wilson began "racking up the points" so as to accomplish his discharge, which then occurred on December 4, 2014. Whether these allegations are true remains to be seen. However, I find that they are more than sufficient to state a

plausible claim against Wilson and Kreber for retaliatory discharge in violation of Section 1981.[10]  Thus, I recommend that the motion to dismiss be denied as to that claim.

## VII.  CONCLUSION

For the foregoing reasons, I RESPECTFULLY RECOMMEND that defendants' motion (Doc. No. 9) to dismiss be **granted in part** and **denied in part**, as follows:

1.      I recommend that all claims brought pursuant to the ICRA be **dismissed without prejudice** on grounds that plaintiff has not exhausted his administrative remedies with regard to those claims.

2.      I recommend that all claims brought pursuant to Title VII and/or the ADA that relate to the termination of Adefris' employment be **dismissed without prejudice** on grounds that plaintiff has not exhausted his administrative remedies with regard to those claims.

3.      I recommend that all claims brought pursuant to Title VII and/or the ADA against the individual defendants (Kreber, LaBrune and Libke) be **dismissed with prejudice** on ground individual employees are not subject to liability under those statutes.

4.      I recommend that all claims for discrimination brought pursuant to Title VII, the ADA and/or Section 1981 be **dismissed with prejudice** on grounds that the allegations set forth in the complaint do not state a plausible claim for relief.

5.      I recommend that all claims for retaliation brought pursuant to Title VII be **dismissed with prejudice** on grounds that the allegations set forth in the complaint do not state a plausible claim for relief.

---

[10] Adefris' allegations of retaliatory discharge do not suggest that defendants LaBrune or Libke played any role in the discharge decision.  As such, I will recommend the dismissal of any Section 1981 retaliation claim that Adefris may purport to allege against those two defendants.

6.    I recommend that all claims for hostile work environment brought pursuant to Title VII, the ADA and/or Section 1981 be **dismissed with prejudice** on grounds that the allegations set forth in the complaint do not state a plausible claim for relief.

7.    I recommend that all claims for retaliatory discharge brought pursuant Section 1981 against defendants LaBrune and Libke be **dismissed with prejudice** on grounds that the allegations set forth in the complaint do not state a plausible claim for relief.

8.    I recommend that the motion to dismiss be **denied**, and that this case therefore proceed, with regard to the remaining claims, which are:

      a.    The ADA failure to accommodate claim, as against Wilson.

      b.    The Section 1981 retaliatory discharge claim, as against Wilson and Kreber.

Objections to this Report and Recommendation in accordance with 28 U.S.C. §636(b)(1) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.   Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.   *See* Fed. R. Crim. P. 59.   Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.   *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 12th day of January, 2016.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE